UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Carol B. Chiasson


        v.                          Civil No. 10-cv-248-JD
                                    Opinion No. 2010 DNH 211

Michael J. Astrue, Commissioner,
Social Security Administration


O R D E R

    Carol B. Chiasson seeks judicial review, pursuant to 42
U.S.C. 405(g), of the decision of the Commissioner of the Social
Security Administration, denying her application for social
security benefits.  Chiasson contends that the decision of the
Administrative Law Judge ("ALJ") should be reversed because the
ALJ erred in his analysis of the record evidence and in posing a
hypothetical question to the vocational expert.  The Commissioner
moves to affirm the decision.


Background

    Carol Chiasson applied for social security disability
insurance benefits on May 8, 2008, alleging a disability
beginning on September 27, 2007, following an automobile
accident.  She alleged a disability because of injuries to her
back, foot, neck, and hip and later added depression as an

additional impairment.  Chiasson was thirty-seven years old at the time of her alleged onset of disability.

Chiasson was involved in a major automobile accident on October 10, 1988.  She suffered multiple injuries, including spine injuries at L1, L2, and L5, and a broken leg.  She was hospitalized for two weeks and underwent subsequent treatment.

Nineteen years later, on September 27, 2007, Chiasson was a front-seat passenger in another automobile accident.  Chiasson's head struck the windshield during the accident.  At Catholic Medical Center's emergency department, she was diagnosed with a head injury, multiple abrasions, and scalp lacerations.  A CT scan of her head showed no acute abnormality although a possible foreign object was noted in the soft tissue.  An x-ray showed a questionable compression fracture in the spine, involving L2. Other x-rays and scans were negative.

On October 2, 2007, Chiasson saw Physician's Assistant Mirno C. Pasquali.  During that visit, Pasquali noted bruising over Chiasson's nose and on her left ear and superficial scrapes on the left side of her body.  Her left ankle was slightly swollen, tender, and painful with motion.

Chiasson returned to Catholic Medical Center on October 8, 2007, for removal of staples from her scalp.  Although those wounds were well healed, Chiasson complained of left foot pain

and dizziness.  She appeared uncomfortable and in mild distress.
Examination of her left foot showed tenderness.  Her x-rays were
reviewed, and again no fractures were found.  Despite Chiasson's
complaints of severe leg and head pain, the provider noted that
she drove herself to the hospital and walked without assistance.

A month later, Chiasson began treatment with Dr. Karen
Calegari, an internal medicine physician.  Chiasson reported her
accident on September 27, and that since that time, she had had
pain in her upper lumbar region, left foot, and neck.  On
examination, Chiasson's left foot was obviously swollen and there
was tenderness over the deltoid ligament on the left.  She had
difficulty walking.  Dr. Calegari ordered x-rays of her lumbar
spine, physical therapy for neck pain, and an aircast for her
left foot pending an MRI, and referred Chiasson to a surgeon
about debris under her scalp.

X-rays and an MRI were done on November 13, 2007, which
showed a mild compression fracture at L2 and a subluxation
anterior process fracture in her left foot.  A surgeon examined
Chiasson's scalp and determined that surgery would not be
beneficial although she would continue to express grains of glass
from her scalp for months or years.  A subsequent MRI of
Chiasson's lumbar spine showed only a mild loss of height
involving L1, consistent with a minimal compression fracture from

an old injury.  Dr. Stepro, an orthopedic surgeon, evaluated
Chiasson's foot in early December and concurred in the radiology
report of an anterior process fracture along with an extensive
bone bruise.  He prescribed a short aircast boot and referred
Chiasson to a pain clinic.

At her next appointment with Dr. Calegari on December 11,
2007, Chiasson reported that she was not taking the prescribed
medications because she had been told one medication would give
her heart problems and the other made her food taste like
oranges.  She also did not attend physical therapy as prescribed.
Examination revealed decreased hip rotation, without point
tenderness, and minimal spasm in the lumbar back.  Dr. Calegari
told Chiasson that her pain should be better than indicated by
her reports and recommended that Chiasson take the prescribed
medications.

Chiasson underwent a physical therapy evaluation on December
27, 2007, during which she reported significant neck, thoracic,
and lumbar pain and significant restrictions in sitting, walking,
sleeping, and lifting.  Physical therapy was recommended.

On January 15, 2008, Chiasson saw Dr. Stepro again about her
foot.  X-rays showed that the fracture had not healed, and Dr.
Stepro thought her pain was related to the fracture.  He planned
to wait another month to see if her symptoms improved before

4

recommending surgery.  At an appointment with Dr. Calegari, also in January, Chiasson complained of lightheadedness since the accident, which bothered her more when looking toward the left or when bending.  Dr. Calegari indicated benign positional vertigo.

Dr. S. Asim Razvi at the Elliot Hospital Pain Management Center evaluated Chiasson on February 1, 2008, for left foot and ankle pain.  Examination revealed a slightly reduced range of motion in the cervical spine, pain over the heal area of her left foot, and no other significant abnormalities.  Dr. Razvi prescribed medication to wean Chiasson from use of a Fentanyl patch and urged her to use acetaminophen or Naprosyn as needed for pain.  On February 2, Dr. Stepro found no change on examination, and offered the option of surgery to remove the broken piece in her heal.  Chiasson indicated that she would like to proceed with surgery.

During follow-up at the Elliott Hospital Pain Management Center, the nurse practitioner noted that Chiasson complained primarily of foot pain and observed some discomfort in the cervical spine.  The nurse practitioner noted that opioid medications would be discontinued because they were not in her long-term best interests.

On March 3, 2008, Chiasson attended an initial pain care consultation with Dr. Michael O'Connell.  Chiasson said that her

pain had become more manageable and that her functioning had improved with narcotic medications.  She denied any side effects from her current medications.  Dr. O'Connell did not examine her foot because she was wearing the aircast boot, concluded that her neck symptoms were consistent with whiplash, and that her low back pain was related to the old injury.  He prescribed Oxycontin for chronic pain.  At follow-up three weeks later, Chiasson reported that the medication was working well although she continued to complain of back, neck, and foot pain.  Dr. O'Connell notified Chiasson that test results from her first appointment were positive for cocaine, which she could not explain.  Dr. O'Connell informed Chiasson that her treatment would be terminated if she tested positive for cocaine a second time.

Dr. Stepro surgically examined Chiasson's left foot on March 25, 2008, but found that the fracture had healed.  Chiasson was discharged with instructions to avoid weight bearing on her left foot.  She was scheduled for follow up in one week.  At her follow up on April 4, Dr. Stepro found that she was walking fairly normally and was definitely better.  He did not think she needed further treatment.

On April 2, 2008, Dr. O'Connell noted that Chiasson's status was unchanged, except for surgery on her foot.  He noted that she

6

was narcotic dependent with a history of a test showing use of an illicit drug.  Dr. O'Connell continued to monitor Chiasson's pain and medication twice a month.  Two months later her overuse of Oxycontin had subsided.  Dr. O'Connell noted improvement and that he would like to eliminate Chiasson's use of a cane to walk.  By September of 2008, Dr. O'Connell wrote that her pain complaints were likely myofascial.

In January of 2009, Dr. David Tung took over Chiasson's treatment at the Paincare Centers of Merrimack.  Chiasson complained of significant low back pain and explained that she had not started prescribed physical therapy because of road conditions.  Although she described pain in her foot as sharp, that pain was not the focus of her complaints.  She said that Oxycontin controlled her pain moderately well.  Dr. Tung noted that Chiasson had attempted to alter her medication prescription, causing him to counsel her to take medication as it was prescribed.  In March, Chiasson reported that her neck and back pain was moderately well controlled on Oxycontin, but she wanted to discuss "break through" pain medications.  Dr. Tung noted that Chiasson had been discharged from physical therapy because of missing appointments.

On May 15, 2009, Chiasson told Dr. Tung that she had fallen and hurt her back the day before and complained of soreness.  She

rated her pain as 8 out of 10.  Examination showed no tenderness.
Dr. Tung wrote that he would discuss tolerance to opioid
medication at the next appointment and added a diagnosis of
opioid dependence.  At the next appointment, in August of 2009,
Chiasson reported that she could garden, do household chores, and
walk.  She denied side effects from medication and said that
Meclizine helped with her dizziness.  Facet loading and rotation
pain generation tests for the thoracic and lumbar spine and
flexation tests were positive.  In October, she reported that her
pain was unchanged although she was taking one or two more pills
per day than the prescribed dosage of Oxycontin.  Testing showed
mixed results, but her gait and station were normal.

        In December of 2009, Dr. Tung reviewed Chiasson's records
and completed disability reports for her.  He noted that Chiasson
reported that her pain was unchanged but that her gait and
station were normal and her head and neck showed normal alignment
and mobility.  On the form for ability to do work related
activities, however, Dr. Tung indicated that Chiasson was
significantly impaired.

        Dr. Tung checked boxes to show that Chiasson could lift less
than ten pounds occasionally and could sit, stand, and walk for
less than two hours per day.  He stated that Chiasson would have
to alternate between sitting and standing every fifteen minutes

and would need to walk for five minutes every hour.  He also thought that Chiasson would need to lie down once or twice each day, that she could never stoop, crouch, climb a ladder, or push or pull more than ten pounds, and that she could only occasionally climb stairs.  He found environmental limitations that would require her to avoid all exposure to extreme cold and heat, fumes, odors, dust, gases, poor ventilation, hazards, and to avoid moderate exposure to wetness, humidity, and noise.  He further said that she would be likely to miss more than three days of work per month and that her limitations were likely to last longer than twelve months.  Dr. Tung attributed Chiasson's limitations to the L1 compression fracture, partial sacralization of L5, and the anterior process fracture in her left heel.

A hearing on Chiasson's application was held on January 19, 2010.  Chiasson and a vocational expert testified at the hearing. Chiasson testified that she had completed the ninth grade in school and that she had no problems with basic reading, math, and writing.  She said that she lived in a second floor apartment and rarely left her home.  Although she had a driver's license, she had not then driven in about two months because her medications made her fall asleep.  She named her past jobs and explained the duties of each job.

Chiasson then testified about the accident in 1988.  She said that she continues to have problems from injuries caused in that accident and that she has to sit on a heating pad at all times.  She explained that her back pain was due to the L1 compression fracture sustained in the 1988 accident.  She said that although the fracture had healed, her back pain had gotten worse over time and that her back "gives out quite a bit."

Chiasson testified that her foot pain was caused by the accident in 2007.  She said that after the accident when she was walking, she heard a loud "crack" sound in her foot.  She testified that her foot was surgically repaired with screws and a plate and that surgery made her foot worse.  She also testified that she could not walk on her foot, could not bend it normally, sometimes has sharp pain in her foot, could only walk sixty feet, and could not stand for more than five minutes.[1]

With respect to her medications, Chiasson testified that they helped with pain only a little bit and made her sleepy and groggy.  She stated further that the medications caused blurry vision, memory problems, and difficulty concentrating.  She said that in a typical day she watched television and cared for her two cats.  She said that her boyfriend did the grocery shopping,

---

[1]Chiasson's testimony differs from her medical records, and the ALJ did not find her to be credible.

10

that they both did cooking, and that others helped her with
cleaning.  She stated that she was receiving Aid to the
Permanently and Totally Disabled from the State of New Hampshire
but that she was trying to terminate that benefit so that she
could get social security benefits.

A vocational expert, Maurice DeMerz, also testified at the
hearing.  DeMerz explained that Chiasson had past work experience
as an inspector, laborer, hand-packager, electronics assembler,
electronics inspector, wire harness assembler, house cleaner,
injection molding machine operator, production assembler, and
fiberglass inspector.  The ALJ posed a hypothetical question to
DeMerz as to whether work existed for a person with the ability
to perform sedentary work, limited to sitting for only an hour at
a time and standing and walking for up to fifteen minutes; an
ability to balance, stoop, crouch, kneel, climb ramps, and climb
stairs only occasionally; no ability to crawl or climb ladders;
and limited to moderately complex four and five step
instructions.  DeMerz testified that a person with the
hypothetical abilities and limitations could work as an
addresser, a call-out operator, and a loader of semi-conductor
dies.  When the ALJ added a limitation of needing to be absent
more than three days per month, DeMerz said that amount of
absenteeism would be unacceptable for work.

11

Chiasson's counsel objected to the hypothetical.  Counsel argued that the record evidence did not show that Chiasson had an ability to sit up to six hours in an eight hour day or to stand and walk for two hours each day.  Chiasson's counsel asked DeMerz whether someone with the limitations indicated by Dr. Tung could perform any work in the national economy.  DeMerz answered that with those limitations, an individual would not be able to work.

The ALJ issued a decision on January 10, 2010.  In the decision, the ALJ found that Chiasson had severe impairments caused by the L1 and foot injuries from her automobile accidents. The ALJ found, nevertheless, that Chiasson retained the residual functional capacity to work at the sedentary exertional level with the limitations that he had included in the hypothetical posed to the vocational expert.  Based on that residual functional capacity, the ALJ concluded that Chiasson was not disabled because she could work in the jobs identified by the vocational expert.  The Decision Review Board did not review the case within the time allowed, making the ALJ's decision the final decision of the Commissioner.

## Discussion

For review, Chiasson contends that the ALJ failed to cite evidence to support his residual functional capacity evaluation,

12

failed to give Chiasson's treating physician's opinion appropriate weight, failed to consider the state's decision that she was disabled, and erred in the hypothetical question posed to the vocational expert.  The Commissioner refutes Chiasson's arguments, arguing that the decision should be affirmed.  Chiasson filed a reply, contending that the Commissioner's motion to affirm provided an impermissible post hoc rationalization for the ALJ's decision.  The Commissioner filed a surreply, responding to the post hoc rationalization argument.

In reviewing the final decision of the Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  § 405(g).  "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010).

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. § 404.1520(a)(4).  The applicant bears the burden of proving that

her impairments preclude her from working through the first four steps.  <u>Freeman v. Barnhart</u>, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the burden shifts to the Commissioner to show that work, which the claimant can do despite her disabilities, exists in significant numbers in the national economy.  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001).

A.  <u>Opinion of Dr. Tung</u>

     The ALJ concluded that Dr. Tung's assessment of Chiasson's functional capacity could not be given significant weight "because it overstates the claimant's limitations relative to his own treatment notes and more generally, because of the claimant's slow, but uncomplicated recovery from her motor vehicle accident in 2007."  Chiasson argues that the ALJ did not properly evaluate Dr. Tung's opinion because the ALJ did not expressly list the factors provided in the applicable regulation for determining whether a treating physician's opinion will be given controlling weight.  <u>See</u> 20 C.F.R. § 404.1527(d).  In addition, Chiasson contends that even if Dr. Tung's opinion was not entitled to controlling weight, it should have been considered, not rejected.

     Section 404.1527(d) provides six factors to be considered in determining the weight to be accorded to a medical opinion. Among the factors are the extent to which the opinion is

14

supported by relevant evidence and whether the opinion is consistent with the applicant's record as a whole.  An ALJ considers all of the listed factors to the extent they are pertinent to the circumstances in that case.  Chiasson cites no requirement that an ALJ must explain each factor in his decision.

The ALJ in this case found that Dr. Tung's opinion lacked support from the medical record and was not consistent with his own medical notes.  For those reasons, the ALJ determined that Dr. Tung's opinion was not entitled to significant weight. Chiasson's medical records amply support the ALJ's assessment. Although a more thorough recitation of the factors and the record would be preferable, the ALJ's decision is not so deficient in this case as to require a remand on that issue.

In addition, the ALJ did not reject the opinion entirely, as Chiasson charges.  Instead, although he found that the opinion was not entitled to significant weight, the ALJ also found that Chiasson was impaired by the symptoms from her spine and foot injuries, indicating that he also considered the opinion as to her limitations.  Therefore, the ALJ accorded Dr. Tung's opinion appropriate weight.

B.  Residual Functional Capacity

The ALJ found that Chiasson retained a residual functional
capacity to do sedentary work with certain other limitations.
Chiasson faults the ALJ's finding on the grounds that he failed
to cite specific medical reports in the record to support his
residual functional capacity assessment and failed to consider
each work-related ability on a function by function basis.  She
further argues that because the ALJ rejected Dr. Tung's opinion,
he impermissibly substituted his own layman's opinion for the
opinion of a treating physician as to Chiasson's limitations.

In response, the Commissioner argued that the ALJ properly
made common-sense judgments about Chiasson's residual functional
capacity without venturing into the impermissible area of
substituting a layman's opinion on a medical issue.  The
Commissioner provided citations to the administrative record to
support the grounds given by the ALJ in support of the residual
functional capacity assessment.  Chiasson challenges the
Commissioner's response as a post hoc rationalization of the
ALJ's decision.

1.  Post-Hoc Rationalization

"The grounds upon which an administrative order must be
judged are those upon which the record discloses that its action

16

was based." <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 87 (1943).  "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  <u>SEC v. Chenery</u>, 332 U.S. 194, 196 (1947).  Therefore, in the context of reviewing a social security decision, the court is limited evaluating the decision "based solely on the reasons stated in the decision," which precludes consideration of other grounds as a means to salvage an otherwise deficient decision.  <u>Robinson v. Barnhart</u>, 366 F.3d 1078, 1084 (10th Cir. 2004): <u>see also</u> <u>Connett v. Barnhart</u>, 340 F.3d 871, 874 (9th Cir. 2003).

Chiasson contends that the Commissioner provided impermissible post hoc rationalizations for the ALJ's residual functional capacity assessment by citing specific parts of the administrative record.  The ALJ made certain findings about Chiasson's impairments, with reference to evidence in the record but without citations to specific pages.  For the most part, the Commissioner merely provided specific record citations for the ALJ's findings to show that they are supported by substantial evidence.  As such, the Commissioner did not provide new grounds to support the ALJ's determination but instead merely provided citations to the record that the ALJ referenced.

In contrast, as the Commissioner acknowledges, the ALJ did not rely on the opinion of the state consulting physician who reviewed Chiasson's records.  The Commissioner argues that the reference to that opinion in the motion to affirm the decision was included only to show additional support for the ALJ's conclusions.  As such, it appears that the Commissioner does not urge the state consulting physician's opinion as a basis for affirming the ALJ's findings.

Therefore, the Commissioner's motion will be considered to the extent it merely provides specific citations that support the ALJ's references to the record.

### 2.   ALJ's Determination of Residual Functional Capacity

Chiasson contends that the ALJ's residual functional capacity assessment is not supported by substantial evidence in the record because the ALJ failed to cite to such evidence and because without Dr. Tung's opinion the decision lacks an acceptable medical source opinion on residual functional capacity.  Chiasson also contends that the record does not support the ALJ's findings.  As noted above, the Commissioner provided specific citations to the record to support the ALJ's findings.

18

"The basic idea which the claimant hawks - the notion that there must always be some super-evaluator, a single physician who gives the factfinder an overview of the entire case - is unsupported by the statutory scheme, or by the caselaw, or by common sense, for that matter." Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). Instead, an ALJ may rely on medical information that relates to the claimant's physical limitations and capacities, which are similar to the capacities provided in § 404.1567(a), to determine residual functional capacity. Id. "[W]here the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996).

Chiasson argues that a "close examination" of Dr. Tung's treatment notes shows that the ALJ erred in concluding that the record did not show that Chiasson had treatment for her foot for approximately two years before the decision. She notes that she complained to Dr. Tung about a "sharp pain" in her foot during that time. Chiasson's complaints, however, were not supported by other evidence. For example, surgery in March of 2008 revealed that her foot had healed without the need for surgery. Chiasson told Dr. Tung that she was able to be more active and was

19

gardening, doing household chores, and walking.  Dr. Tung noted that her gait and standing were normal.  Therefore, Chiasson's complaints do not show that the ALJ erred in finding that she had not received treatment for her foot.

The ALJ's residual functional capacity finding is amply supported by his references to the record.  The sedentary exertional level with additional restrictions more than adequately addresses Chiasson's impairments and limitations.

C.   State Benefits

Chiasson asserts that the ALJ erred in failing to consider that the State of New Hampshire awarded her benefits under the Aid to the Permanently and Totally Disabled program.  As the Commissioner points out, however, the only evidence Chiasson provided that she had been awarded benefits was her own statements.  At the hearing, she said that she had been awarded benefits but was trying to discontinue them to be eligible for social security.  Chiasson did not provide the state's decision for the ALJ's consideration.  Therefore, the ALJ did not err in failing to mention that decision.

D.  Hypothetical Question

As a corollary to her argument that the ALJ's residual functional capacity assessment was not supported by substantial evidence, Chiasson argues that the ALJ's hypothetical to the vocational expert was not supported by the record evidence. Therefore, Chiasson contends, the vocational expert's opinion about jobs she could perform does not satisfy the Commissioner's burden at the fifth step in the sequential analysis.  Because the court has determined that the ALJ's residual functional capacity assessment was supported by substantial evidence, the issue is resolved.

## Conclusion

For the foregoing reasons, the decision is affirmed.  The plaintiff's motion to reverse (document no. 7) is denied.  The Commissioner's motion to affirm (document no. 8) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

December 14, 2010

cc:  Robert J. Rabuck, Esquire
     Jeffry A. Schapira, Esquire